**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GMH CAPITAL PARTNERS LP, | : CIVIL ACTION NO. |
| *Plaintiff*, | : |
| v. | : |
| JACLYN FITTS, CBRE CAPITAL ADVISORS, INC., AND CBRE, INC., | : **COMPLAINT** |
| *Defendants*. | : JURY TRIAL DEMAND |

Plaintiff GMH Capital Partners LP ("GMH" or "Plaintiff"), by and through the undersigned counsel, as and for its Complaint against Defendants Jaclyn Fitts, CBRE Capital Advisors, Inc., and CBRE, Inc. (collectively, the "Defendants"), hereby alleges as follows based on knowledge of its own actions, and on information and belief as to all other matters:

**BACKGROUND**

1.      This is a case about greed, disloyalty and betrayal.  Plaintiff GMH is a vertically integrated real estate company that identified and secured a promising off-market portfolio acquisition opportunity in the student housing space commonly known as the "PAC Portfolio" and invested approximately $6.5 million (in deposit and diligence costs/time) for an exclusive opportunity to close the deal.  Once the exclusivity was achieved, Plaintiff then set about securing equity financing.

2.      Important to note is that GMH had the exclusive look at the PAC Portfolio before other competitors had an opportunity to bid, and the opportunity to purchase a substantial portfolio of solid student housing assets that were not on the market.

3.     To complete the transaction, GMH placed a deposit of $4,750,000 and sought a broker to raise the debt and equity portion of the transaction.

4.     In pursuit of this deal, GMH performed countless hours of diligence, modeling, site visits, financial analysis and performed substantial internal analysis on improvements and profitability studies on the PAC Portfolio.  All of these studies, projections, analysis and diligence was not in the public realm, was proprietary to GMH, was integral to GMH's plans for profitability and valuation of the PAC Portfolio and was a trade secret which GMH protected and valued.

5.     None of the proprietary trade secrets, diligence or materials were in the possession of any person not otherwise subject to confidentiality agreements other than GMH until such were provided to Defendants pursuant to a Non-Disclosure Agreement while GMH was evaluating whether to retain Defendants as their sole advisor/banker to raise the equity for the purchase of the PAC Portfolio.

6.     This deal was of the utmost importance to GMH, and so it carefully considered the selection of its equity financing consultant.  Defendants provide such services and vied for GMH's partnership by touting the specialized knowledge and expertise of its team, including Defendant Jaclyn Fitts ("Fitts") -its Director of National Student Housing.  Defendants' pitch worked and GMH retained Defendants on the condition that Fitts, specifically, be engaged as part of the GMH team to secure equity and close the PAC transaction.

7.     Under the terms of the parties' agreement (the "Engagement Agreement", defined infra.) and despite caveats to allow other CBRE verticals to do business generally, CBRE agreed that notwithstanding that, and under no circumstances would CBRE provide services in connection with any strategic transaction substantially similar to the PAC transaction for any company whose

2

primary business was "student housing development, management, ownership or operation, without the Company's prior written consent …"

8.      The Defendants' role was to be the advisor and banker to GMH and GMH alone until the Engagement Agreement was terminated.  The Defendants were not permitted to use GMH's trade secrets and proprietary information to assist any other person or party at any time related to the PAC Portfolio.

9.      As it has now become clear, the Defendants abandoned their duties to GMH at the earliest possible instance and sought to take the exclusive opportunity and wealth of proprietary and trade secret data of GMH and earn millions of dollars of fees from third parties while making sure that Defendants' preferred buyer obtained the PAC Portfolio and GMH received nothing.

10.     The Defendants agreed to be loyal to GMH and keep GMH's proprietary and valuable trade secrets confidential.  The Defendants knew that GMH's proprietary trade secrets gave GMH an advantage in the market as it relates to the PAC Portfolio acquisition.

11.     The Defendants were also well aware of the potential value and profit GMH could unlock if GMH or any buyer acquired the PAC Portfolio because GMH provided Defendants with GMH's plans, processes, valuations and diligence.

12.     In order to protect and secure the proprietary trade secrets of GMH, GMH required Defendants to execute a separate non-disclosure agreement pursuant to which GMH provided Defendants, including Fitts, with detailed, proprietary analyses and strategies relating to its acquisition proposal to assist Defendants in matching GMH with an appropriate equity source. GMH trusted Defendants to abide by the agreement and safeguard its trade secret and commercially sensitive confidential information.  GMH only realized years later that its trust and

confidence were misplaced and had been compromised.  GMH did not realize the Defendants' betrayal and subterfuge immediately after it lost the PAC transaction to a competitor.  It was only later, as all of the pieces fit together, that GMH understood that the Defendants, upon information and belief, used the GMH proprietary materials to assist a competitor in the student housing space, paired with an equity partner CBRE had on GMH's list of potential equity sources, to purchase the PAC Portfolio.  What GMH learned is that CBRE Capital Advisors, Inc., and CBRE, Inc., were plagued by in-fighting regarding commission structures.  Because of this structure, Defendant Fitts stood to make a substantially higher fee as the listing broker on the transaction than if she remained a part of the GMH equity team and GMH closed the PAC transaction.

13.     The conflict of interest was clear to Defendants but undisclosed to GMH, and Defendants had a choice: commit to working with GMH in good faith or sever their relationship with GMH entirely so that GMH could work with a true partner.  Defendants, instead, decided that they wanted it all.  The Defendants acted as if they were attempting to raise money for GMH while simultaneously enriching themselves at GMH's expense by selling the PAC Portfolio to a competitor of GMH, and, upon information and belief, raising the debt and equity for that buyer.

14.     Specifically, Defendants engaged in a scheme to sabotage GMH's potential acquisition of the PAC Portfolio.  Given her financial disincentive, orchestrated and permitted by CBRE, to assist GMH in finding an equity partner and closing the deal, when GMH's exclusivity period under its agreement with PAC lapsed, Fitts recused herself from the GMH team to list the PAC Portfolio as the lead broker, thereby releasing the deal to other competitors (including GMH).  None of these facts were disclosed to GMH when Fitts left the team.

15.     While GMH believed Fitts remained an ally, she instead worked against GMH.  Shortly after Fitts acquired the listing for the PAC Portfolio in or around early May of 2020, while

the Defendants remained subject to the Engagement Agreement with GMH, upon information and belief, CBRE contacted TPG Realty Partners, Inc. ("TPG"), an equity source CBRE had on GMH's list.  CBRE contacted TPG to advise TPG that the PAC Portfolio was coming to market. TPG and Cardinal Group Investment Management LLC, a competitor to GMH in the student housing space, were engaged by CBRE to bid on the PAC Portfolio.  The TPG/CBRE[1] team quickly got to work based on the information and "early look" CBRE provided and, upon information and belief, CBRE helped the TPG/Cardinal team negotiate early exclusive access to the deal with PAC to the exclusion of all other bidders while the bid process was purportedly underway.

16.    Importantly, the deal room for the PAC Portfolio did not open to competitors, including GMH, until June 16th.  This early look/early access allowed the TPG/Cardinal team to submit a bid ahead of where GMH had been when under contract with PAC the first week of July 2020, well in advance of the July 31 deadline for the competitive bidding process.  To be clear, at the same time CBRE is providing an "early look" to TPG/Cardinal and negotiated early exclusive access for the TPG/Cardinal team on the deal during the purportedly competitive bid process, CBRE is subject to the Engagement Agreement with GMH and duty and agreement bound to assist GMH.  This is an undisclosed and material conflict that every rookie real estate professional knows to avoid.

17.    Upon information and belief, Defendants assisted GMH's competitor and its equity partner in securing and closing the deal through the misuse of GMH's proprietary and confidential information concerning that same acquisition.  Had GMH known that Defendants may have had

---

[1] Importantly, it is understood that Defendant Fitts had a pre-existing business relationship with the Vice President of Acquisitions at Cardinal, Gregory Martini, formerly a GMH employee, and is understood to also have a business relationship with Ty Newell at TPG.

an incentive to misappropriate its information, it would have taken additional steps to protect it. Defendants thus weaponized their fiduciary relationship with GMH to lull GMH into the belief that its information was safe and its interests represented. Defendants engaged in this same subterfuge to prevent GMH from learning of its wrongdoing.

18.     Defendants' wrongdoing was intentional, egregious, and ultimately, quite lucrative for Defendants. Defendants received financial consideration for their involvement in the deal they closed for GMH's competitor. Indeed, Defendant Fitts received substantially more financial consideration as the listing broker on the PAC transaction than she stood to earn as part of the GMH equity brokerage team. GMH, on the other hand, suffered immensely. Defendants induced GMH to trust it as a partner and a fiduciary and, once GMH did so, Defendants betrayed GMH and caused it to ultimately lose a business opportunity of over $475,000,000.

## JURISDICTION

19.     The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, 18 U.S.C. § 1836(b) and 28 U.S.C. § 1367 in that plaintiffs assert claims under the laws of the United States, including the Defend Trade Secrets Act of 2016, 18 U.S.C. §§ 1832-1839 ("DTSA") and the state law claims asserted herein are so related to plaintiffs' federal claims that they form part of the same case or controversy.

20.     Venue is proper under 28 U.S.C. § 1391 in that a substantial part of the events or omissions giving rise to the claims occurred and the property at issue is located in this District.

## PARTIES

21.     Plaintiff GMH Capital Partners, LP, is a Delaware limited partnership with its principal place of business located at 10 Campus Boulevard, Newtown Square, Pennsylvania, 19073.

22.     Defendant CBRE Capital Advisors, Inc. is a Delaware corporation with its principal place of business located at 200 Park Avenue, 18th Floor, New York, New York, 10166.

23.     Defendant CBRE, Inc. is a Delaware corporation with its principal place of business located at 2100 McKinney Avenue, Suite 1250, Dallas, Texas, 75201.  It is the parent company of Defendant CBRE Capital Advisors, Inc.

24.     Defendant Jaclyn Fitts is a citizen of Texas who is believed to reside at 17735 Windflower Way, Dallas, Texas, 75252-5207.

25.     At all times relevant to this Complaint, Defendant Fitts was authorized to act as an agent of CBRE Inc. and CBRE Capital Advisors, Inc.

26.     In particular, at all relevant times to this Complaint, Defendant Fitts served as CBRE's Director of National Student Housing Group.

**FACTS**

I.   **GMH Expends Substantial Time, Effort, and Expense Contracting with Preferred Apartment Communities, Inc.**

27.     GMH originated as a family-owned real estate company.

28.     Today, it has evolved into a multifaceted office, investing in real estate assets and operating companies.  It works to build portfolios with a focus on growth and asset preservation.

29.     On or about May 24, 2019, GMH entered into an agreement to purchase a portfolio of eight student-housing assets from Preferred Apartment Communities, Inc. ("PAC").  These eight assets can be referenced, collectively, as the "PAC Portfolio."

30.     At that time, the PAC Portfolio was not offered for sale to the public.

31.     Rather, GMH approached the owners of PAC directly, based on GMH's proprietary research and strategy discussions, with an offer to purchase the PAC Portfolio.

32.     Under the May 24th Agreement, GMH agreed to purchase the PAC Portfolio for $475,000,000 ($475 million).

33.     GMH paid PAC a $4.75 million non-refundable deposit and further incurred over a million dollars of internal diligence time plus hundreds of thousands of dollars in diligence costs pursuant to the May 24th Agreement.

34.     The Agreement afforded GMH an exclusive right until March 4, 2020, to finalize its purchase of the PAC Portfolio.

35.     Between May of 2019 and in or about March of 2020, GMH invested significant effort and money on an array of detailed due diligence including, but not limited to, site visits, third party reports, title and survey, market analysis, university research, capital expenditures and property budgets calculations of future revenues and property values and return on investments. The cost of this proprietary information was several million dollars and the potential value to GMH exceeded $70,000,000.

II.     **GMH Hires CBRE to Advise GMH on the PAC Portfolio Sale.**

36.     CBRE Capital Advisors, Inc., a subsidiary of CBRE, Inc., (collectively, "CBRE") claims over 100 years of combined real-estate investment bank experience with expertise in all forms of capital raising and advisory services.

37.     CBRE offers clients strategic advice and investor access across the spectrum of real estate investment banking activities.

38.     In or around late January and February 2020, Defendant CBRE pitched its services to help GMH secure capital to acquire the PAC Portfolio.

39.     In particular, in the parties' discussions at a meeting on or about January 21, 2020, Defendants noted the expertise of Defendant Fitts, its Director of National Student Housing Group, in the student housing market.

40.     CBRE was successful in convincing GMH that Defendant Fitts' knowledge rendered her indispensable to GMH's financing efforts, and so, GMH insisted on her involvement if the parties were going to work together.

**A.     GMH and CBRE Execute the Nondisclosure Agreement.**

41.     In order to secure GMH's confidential, proprietary, and trade secret information, GMH and CBRE executed a confidentiality agreement entitled "Nondisclosure Agreement," on January 26, 2020.  See Exhibit A.

42.      CBRE was defined as the "Recipient" of GMH's information.  See Exhibit A.

43.     Paragraph 1, Section (b) of the Nondisclosure Agreement, entitled "Confidential Information," defined Confidential Information related to GMH's business:

> "Confidential Information" includes, but is not limited to, offering materials, notes, plans, legal agreements, models, analyses, track records, financial statements and other financial records, executive and employee compensation data, due diligence materials (including, without limitation, presentations or investment memorandums as well as drafts, amendments or derivative works thereof), compilations, studies, interpretations, documents or records containing, referring, relating to, based upon or derived from any Confidential Information, in whole or in part. The term "Confidential Information" does not include information that (a) was or becomes generally available to the public other than as a result of a disclosure by the Recipient in violation of this Agreement, (b) was or becomes available to the Recipient from a source other than GMH or the Venture, provided that such source is not known by the Recipient to be bound by any agreement with GMH or the Venture to keep such information confidential, or otherwise prohibited from transmitting the information to the Recipient by a legal, fiduciary or other obligation, (c) was already known to the Recipient at the time of disclosure hereunder, or (d) is independently developed by or for the Recipient by its employees.

See Ex. A, ¶ 1.

44.     In Paragraph 2 of the Nondisclosure Agreement, CBRE specifically agreed not to "use Confidential Information for any purpose other than to evaluate the Proposed Investment and shall not disclose Confidential Information to any third party; provided, however, that the

Recipient may disclose Confidential Information to its employees who require such information to assist the Recipient in evaluating the Proposed Investment." See Ex. A, ¶ 2.

45.     CBRE further agreed as follows: "Prior to granting any employee access to Confidential Information, the Recipient shall insure that such employee is subject to restrictions on use and disclosure which cover the Confidential Information and are no less restrictive than the restrictions contained in this Agreement." See Ex. A, ¶ 2.

**B.     GMH and CBRE Execute the Letter Agreement.**

46.     CBRE representatives met with GMH again on or about February 5, 2020, in Newtown Square, Pennsylvania.

47.     At that meeting, CBRE presented a "pitch book" to GMH in which CBRE promoted itself as uniquely positioned to recruit new equity financing for GMH's purchase of the PAC Portfolio.  The pitch book contained CBRE specialists in debt and equity sources and student housing.

48.     CBRE prominently included Defendant Fitts as part of the team.

49.     GMH was so impressed with Fitts' unique expertise and experience that it agreed to retain CBRE on the condition that Fitts take a substantial lead role in GMH's efforts to obtain financing for the purchase of the PAC Portfolio (the "PAC Deal").

50.     Defendants agreed and on or about February 26, 2020, GMH and CBRE entered into an Agreement (the "Letter Agreement") whereby CBRE agreed to act as GMH's exclusive financial advisor to find and procure equity financing for GMH's purchase of the PAC Portfolio. See Exhibit B.

51.     Pursuant to the Letter Agreement, CBRE agreed that, among other things, CBRE would contact potential equity sources and assist GMH in negotiating programmatic joint venture

limited partnership agreements with potential investors and/or their representatives.  See Ex. B, ¶ 1.

52.    Importantly, CBRE agreed not to compete with GMH in this or any "substantially similar" transaction.   Section 8(f) of the Engagement Agreement states as follows: "Notwithstanding anything to the contrary in this Section 8(f) or this letter agreement, CBRE Cap agrees that during the term of this letter agreement, CBRE Cap shall not provide financial advisory services in connection with any strategic transaction through the issuance of privately placed equity substantially similar to the Transaction contemplated herein for any company whose primary business is student housing development, management, ownership or operation without the Company's prior written consent. . ."

53.    Specifically, Paragraph 8, Section (f) of the Letter Agreement articulated, in relevant part, that CBRE "shall not provide financial advisory services in connection with any strategic transaction through the issuance of privately-placed equity substantially similar to the Transaction contemplated herein for any company whose primary business is student housing development, management, ownership or operation, without the Company's prior written consent[.]"  See Ex. B, ¶ 8(f).

54.    The Letter Agreement defined the aforesaid services as the "Financing."  Id.

55.    For its part, GMH agreed to pay CBRE a "(a) Financing Fee; [and] (b) Expenses," see Ex. B, ¶ 3, §§(a)(b), and to provide CBRE with information relating to its business operations, assets, liabilities, financial condition, and prospects, see Ex. B, ¶ 2, § (a)(i)-(ii) such that CBRE would raise the capital for GMH through private equity, debt, structured debt and multiple variations thereof with GMH as the general partner.

**C.      GMH Shares its Trade Secret, Confidential, and Proprietary Information with Defendants.**

56.      At all times relevant to this Complaint, Defendant Fitts was employed by CBRE.

57.      Fitts served as CBRE's Director of National Student Housing Group and her principal place of business during this time was Dallas, Texas.

58.      Between in or about January 2020 and in or about February 2020, CBRE assigned Defendant Fitts as part of the team to consult with GMH on the acquisition of the PAC Portfolio.

59.      The assignment of Defendant Fitts to this project was at GMH's request and a necessary condition for GMH to proceed with CBRE.

60.      Through the course of this assignment, Defendant Fitts frequently communicated with GMH representatives in Pennsylvania via phone, email, and video conferences, among other methods.

61.      Pursuant to the Nondisclosure Agreement, GMH shared with Defendant Fitts (and other representatives of CBRE) trade secret, proprietary, and confidential information, including, but not limited to, its strategic vision for the acquisition, its financial estimates and projections, potential equity sources, third-party reports, underwriting, site-visit reports, and voluminous proprietary work product as to how the deal to acquire the PAC Portfolio could be closed and then managed efficiently in subsequent years (collectively, "Information").

62.      The Information shared with Defendant Fitts and CBRE revealed the details of GMH's strategies to close and generate profit on its $475 million purchase of the PAC Portfolio.

**III.      The COVID-19 Pandemic Interrupts GMH's Efforts to Secure Capital.**

63.      GMH continued to work closely — and share its trade secret, proprietary, and confidential information — with Defendants from in or about January 2020 through and including in or about July 2020.

64.     In particular, GMH worked closely with Defendant Fitts to create a viable financing strategy which, when integrated with GMH's proprietary strategic modeling and due diligence, retained the potential for sustainable profits.

65.     As part of that strategy CBRE created a list of potential equity sources for GMH that included TPG, among others.

66.     Defendants, however, failed to facilitate an introductory discussion between TPG and GMH until several months later, by which time TPG expressed interest in working with GMH, but advised it already had a conflict on the PAC transaction.

67.     Consequently, GMH lost the opportunity to partner with TPG and close the deal to acquire the PAC Portfolio during GMH's period of exclusivity with PAC.

68.     In or about early March 2020, GMH continued collecting and refining its due diligence in furtherance of its purchase of the PAC Portfolio.  And, in the usual course, GMH continued sharing its trade secret, proprietary, and confidential Information with Defendants in or about March 2020, including with Defendant Fitts.

69.     Thereafter, the COVID-19 Pandemic interrupted GMH's plans to finalize its acquisition strategy.

70.     In or about mid-March 2020, Defendants received notice that a material portion of their proposed equity for the PAC Portfolio deal would likely be unavailable until the COVID-19 Pandemic stabilized.

71.     This information was shared with PAC.

72.     PAC continued to work exclusively with GMH until June of 2020.

**IV.**     **Defendants Willfully and Maliciously Betray GMH.**

73.     Unbeknownst to GMH, Defendants willfully and maliciously betrayed GMH by "switching horses" in the race to arrange for another party (TPG/Cardinal) to purchase the PAC

Portfolio for their own financial gain by advising the buyer on structuring a programmatic joint venture together to employ private equity and debt to complete the purchase and subsequent purchases in direct contravention of CBRE's letter agreement with GMH.

74.     While the Letter Agreement and Nondisclosure Agreement operated in full force and effect, Defendant Fitts went behind GMH's back to take an assignment to list the PAC portfolio for sale and ultimately worked with a known potential GMH equity investor and a GMH competitor buyer to secure the PAC Portfolio for that buyer ahead of the marketed bid process.

75.     Upon information and belief, CBRE assisted Fitts in doing so.

76.     GMH learned of Defendants' surreptitious misconduct in or about 2023.

**A.     Defendant Fitts Pursued Her Own Interests at GMH's Expense.**

77.     Upon information and belief, Defendant Fitts was never motivated to assist GMH in securing a joint venture partner and closing the PAC Portfolio.

78.     This conflict makes sense given the financial incentives at play here.

79.     Upon information and belief, CBRE is responsible for establishing commission rates for its employees.

80.     Upon information and belief, CBRE established a commission structure that financially incentivized employees to broker deals rather than represent potential buyers in a transaction.

81.     As a result, Defendant Fitts was unhappy with her proposed share of compensation for Defendants' work on GMH's acquisition of the PAC Portfolio.

82.     Specifically, Defendant Fitts typically worked on the brokerage side of CBRE, but at GMH's insistence, Defendant Fitts was added to the GMH project as a condition for GMH to engage CBRE.

83.     Upon information and belief, this would have resulted in Defendant Fitts receiving a lower share of compensation from the purchase of the PAC Portfolio by GMH than if she and her colleagues in CBRE's brokerage group had sold the PAC Portfolio and earned a brokerage fee.

84.     As a result, Defendant Fitts had little to gain by fulfilling her duties to GMH by assisting it in locating capital for the PAC Portfolio, as doing so would inure her of the limited GMH fee to the exclusion of a larger brokerage fee.

85.     Conversely, Defendant Fitts would be placed in a much more lucrative position if GMH was unable to find an equity partner, the tentative PAC Deal fell through, and Defendant Fitts could then seize the opportunity to represent PAC as broker and secure a sizeable brokerage fee.

86.     In such a situation, CBRE stood to earn its full fee with GMH for finding GMH an equity partner for future deals *and* Defendant Fitts could secure a large broker services fee by representing PAC in the sale of its Portfolio,

87.     Upon information and belief, Defendant Fitts went one step further and realized that she could pocket even more from the transaction if she were to further assist one of GMH's competitors in securing the PAC Portfolio.

88.     And so, Defendant Fitts channeled her greed into a plan to sabotage GMH's efforts to acquire the PAC Portfolio.

**B.     Defendant Fitts Removes Herself from the GMH Assignment and Takes the PAC Portfolio to Market.**

89.     On March 4, 2020, GMH lost its exclusive right to purchase the PAC Portfolio.

90.     Upon information and belief, in or about April 2020, Defendant Fitts secured the brokerage listing of the PAC Portfolio.

91.     Upon information and belief, Fitts was its lead broker.

15

92.     On or about April 22, 2020, Defendants advised GMH that Defendant Fitts was removing herself from the CBRE team advising GMH due to an unspecified "conflict," the nature of which Defendants never disclosed to GMH.

93.     Standing alone, the loss of Defendant Fitts and her expertise from the CBRE team was damaging to GMH's ability to obtain financing.

94.     On or about June 10, 2020, Defendant Fitts notified GMH that she was taking the PAC Portfolio to market on behalf of PAC and that the data room would be available for new potential bidders on or about June 16, 2020.

95.     While Defendants never specified the nature of the conflict of interest that caused Defendant Fitts to resign from her involvement with GMH, GMH now believes that the conflict arose from Defendant Fitts' representation of PAC in the sale of the PAC Portfolio which was a conflict with the CBRE representation of GMH.

96.     Defendants affirmed GMH's belief in that regard by failing to inform GMH of the nature of the conflict of interest and allowing GMH to draw its own conclusion based on the temporal proximity between Defendants' notice of the conflict and Fitts' subsequent representation of PAC in the sale of the PAC Portfolio.

97.     CBRE subsequently informed GMH that Defendant Fitts was unhappy with her compensation with respect to her work for GMH.

98.     GMH had no reason to believe at this time that Defendants were disloyal to GMH or that GMH's confidential information was anything but secure.

99.     Consistent with its belief that Defendants continued to safeguard GMH's trade secret, proprietary, and confidential Information, GMH did not seek to terminate its relationship with CBRE, preclude Defendant Fitts from representing another interested party, or seek additional

guarantees that Defendant Fitts and other conflicted CBRE employees could not access GMH's Information.

100.    GMH thus informed PAC and Defendant Fitts of its intention of participating in this bidding process, and GMH continued to work closely with Defendants to prepare and timely submit a bid that took advantage of its "head start" arising out of its sourcing of this off-market deal.

101.    Likewise, PAC signaled its desire to continue to work with GMH by agreeing to apply GMH's approximately $4.75 million non-refundable deposit to the ultimate purchase price.

**C.    Defendant Fitts Misappropriates GMH's Trade Secrets and Confidential Information and Assists One of GMH's Competitors in Winning the PAC Portfolio.**

102.    Little did GMH know that, at this time, Defendants were actively working behind its back to sabotage its efforts.

103.    Upon information and belief, after Defendant Fitts secured the brokerage listing of the PAC Portfolio, she worked with known viable equity investor TPG and another student-housing real-estate company, Cardinal, which was a direct competitor of GMH, to purchase the PAC Portfolio.

104.    Upon information and belief, Defendant Fitts, in violation of the Letter Agreement, Nondisclosure Agreement, and all of Defendants' legal and professional duties, agreed to assist TPG and Cardinal to work together to acquire the PAC Portfolio on terms more favorable to her than what she could have obtained from GMH's successful acquisition of the Portfolio.

105.    Upon information and belief, as a further betrayal, Defendant Fitts shared GMH's Information relating to the PAC Portfolio with TPG and Cardinal.

106.    Upon information and belief, in conjunction with Defendant Fitts, Cardinal representatives used GMH's information to prepare their own models and projections about the PAC Portfolio *before the project was opened for public bidding*.

107.    Upon information and belief, Defendant Fitts did not use CBRE's email servers to communicate with Cardinal or TPG because she knew that working with Cardinal violated her duties to GMH.

108.    Nevertheless, and upon information and belief, CBRE was aware that Defendant Fitts was not only representing PAC in the sale of the Portfolio but was also coordinating with and assisting Cardinal and GMH.

**D.    Defendant Fitts Helps Cardinal Submit a Winning Bid.**

109.    On or around June 16, 2020, PAC offered the PAC Portfolio deal for public bidding.

110.    The deadline for submission of all bids was on or about July 30, 2020.

111.    On November 3, 2020, GMH learned that PAC had definitively closed the sale of the Portfolio to TPG and Cardinal (collectively, the "Buying Group").

112.    That, however, is all that GMH knew, and GMH had no reason to suspect that Defendants were in any way responsible for the Buying Group's successful acquisition of the PAC Portfolio.

113.    GMH certainly did not know that the Buying Group submitted its $478.7 million bid on July 1, 2020, which was *one month* ahead of schedule and just two weeks after the data room opened—an impossible feat given the complexity of the bid and the travel limitations imposed by COVID-19.

114.    Upon information and belief, Defendant Fitts willfully and maliciously shared GMH's Confidential Information with the Buying Group in violation of her contractual and fiduciary obligations to GMH.

18

115.    Put bluntly, CBRE's breach of its agreement to work against GMH and with its competitor to secure the PAC transaction and alleged misappropriation of GMH's information is the only way that the Buying Group was able to submit a bid on such a massive deal in such a compressed time frame — especially during the early stages of the COVID-19 Pandemic.

116.    Moreover, because the Defendants improperly shared GMH's confidential Information and worked with Cardinal/TPG against GMH's interests to ensure its bid met PAC's expectations, the Buying Group's bid was highly competitive.

117.    The Buying Group would not have been able to submit a winning bid a mere two weeks after the PAC Portfolio was listed by Defendant Fitts for sale had Defendants not violated their contractual, fiduciary, and other legal obligations to GMH.

118.    Upon information and belief, Defendant Fitts used GMH's trade secret and confidential information to negotiate compensation for herself as broker of record on the PAC Portfolio, which again, greatly exceeded her share of the limited fee she would have received had GMH closed the deal.

119.    As a result of the Buying Group's winning bid, GMH lost the $4,750,000 non-refundable deposit that it paid to PAC pursuant to the original purchase agreement of May 24, 2019, together with the lost opportunity associated with ownership of the Portfolio properties, all potential profits or increased value of the PAC Portfolio of in excess of $70,000,000, and diligence costs of over $1,500,000  Defendants received ill-gotten commissions and profits of in excess of $5,000,000 upon information and belief, all of which must be disgorged.  Further, the willful and malicious nature of the Defendants' violation of GMH's trade secrets warrants the doubling of all damages as to all Defendants on a joint and several basis.

## COUNT I – BREACH OF CONTRACT
### BREACH OF THE LETTER AGREEMENT
### (All Defendants)

120.    GMH hereby repeats, realleges, and incorporates by reference the allegations in the preceding paragraphs, as if set forth herein.

121.    GMH and CBRE entered into an affiliation, the terms of which were memorialized in the Letter Agreement executed on February 26, 2020.  *See* Exhibit B.

122.    Defendant CBRE assigned Defendant Fitts to consult GMH on the Financing of the PAC Portfolio, pursuant to the terms in the Letter Agreement.

123.    The Letter Agreement is a valid, written and binding contract.

124.    GMH performed its obligations under the Letter Agreement, including but not limited to, paying CBRE's fees and expenses under the Letter Agreement.

125.    Upon information and belief, Defendants breached the Letter Agreement by:

(a)    Failing to act as GMH's exclusive financial advisor, in violation of Paragraph 1 of the Letter Agreement;

(b)    providing advisory services in connection with PAC of a substantially similar Transaction to a third party pursuant to Paragraph 8, Section (f) of the Letter Agreement; and

(c)    entering into a transaction with a party similar to, in competition with, or which otherwise could have the effect of preventing GMH from receiving the full benefits of the transactions contemplated in the Agreement pursuant to Paragraph 6 of the Letter Agreement; and

(d)    Sharing GMH's confidential and proprietary information with a competitor; and

(e)    Upon information and belief raising debt and equity capital for the TPG/Cardinal acquisition of the PAC Portfolio, the very transaction for which GMH retained the

Defendants on an exclusive basis. **Multi Family Executive, November 12, 2020 (https://www.multifamilyexecutive.com/business-finance/tpg-real-estate-partners-and-cardinal-group-acquire-student-housing-portfolio_o)**

126.    As a result of Defendants' breaches of the Letter Agreement, GMH has been damaged, including but not limited to: (i) all of GMH's diligence costs and time, and (ii) the loss of its $4.75 million deposit to PAC for the PAC Portfolio.

127.    As a result of Defendants' breaches of the Letter Agreement, GMH has been further damaged to the extent of its lost business opportunities that it would have consummated had Defendants performed under the Letter Agreement, including but not limited to, loss of profits, loss of management fees, loss of portfolio growth, and loss of real estate appreciation over time, and loss of other ancillary revenue associated with the PAC Deal.

## COUNT II – BREACH OF CONTRACT
### BREACH OF THE NONDISCLOSURE AGREEMENT
**(All Defendants)**

128.    GMH hereby repeats, realleges, and incorporates by reference the allegations in the preceding paragraphs, as if set forth herein.

129.    As part of the Letter Agreement, GMH and CBRE executed a Nondisclosure Agreement on February 26, 2020, in which CBRE was the Recipient.

130.    Under the terms of the Letter Agreement, Defendant Fitts was employed by CBRE as a consultant, and CBRE assigned her to consult GMH on the Financing of the PAC Portfolio. In furtherance of that effort, GMH shared Confidential Information with Defendant Fitts.

131.    The Nondisclosure Agreement between GMH and CBRE is a valid, written, and binding contract.

132.    The Nondisclosure Agreement specifically provides: "The Recipient understands and agrees that its breach or threatened breach of this Agreement will cause irreparable injury to

GMH, the Venture and/or PAC and that monetary damages will not provide an adequate remedy thereof. The Recipient hereby agrees that, in the event of such a breach of threatened breach, the other Parties shall be entitled, without the requirement of posting a bond or other security, to equitable relief, including injunctive relief and specific performance." See Ex. A, ¶ 7, § (d).

133.    Upon information and belief, Defendants breached the Nondisclosure Agreement by:

(a)     disclosing GMH's Confidential Information to solicit business on behalf of CBRE, in violation of Paragraph 2 of the Nondisclosure Agreement and

(b)     retaining and utilizing GMH's Confidential Information for purposes of diverting business away from GMH, in violation of Paragraph 6 of the Nondisclosure Agreement.

134.    The breaches by Defendants were material, willful, and malicious.

135.    As a result of the Defendants' breaches of the Nondisclosure Agreement, GMH has been damaged, including but not limited to, (i) loss of its confidential and proprietary information, (ii) loss of business opportunities, and (iii) loss of business profits.

136.    The wrongful conduct by Defendants caused irreparable harm and damage to GMH, and it continues to cause harm and damage to GMH through the present day.

## COUNT III – BREACH OF FIDUCIARY DUTY
### (All Defendants)

137.    GMH hereby repeats, realleges, and incorporates by reference the allegations in the preceding paragraphs, as if set forth herein.

138.    GMH entered into a confidential consulting relationship with Defendants in which GMH placed Defendants in a central, trusted role in GMH's affairs with respect to the PAC transaction.

139.     GMH entrusted Defendants to act as its fiduciary, to, among other things: (i) operate and manage on GMH's behalf, (ii) develop a viable financing strategy which, when integrated with GMH's proprietary financial and strategic modeling and due diligence, retained the potential for sustainable profits, and (iii) protect GMH's Information, and (iv) act in GMH's best interests with respect to the PAC Deal.

140.     Accordingly, Defendants held positions of authority and trust and retained control over the financing of GMH's efforts to purchase the PAC Portfolio.

141.     Defendants induced GMH to, and did, repose trust and confidence in CBRE and Fitts and, in its knowledge and expertise, to represent GMH's interests with respect to the PAC Deal.

142.     Upon information and belief, Defendants breached their fiduciary duties to GMH by their wrongful conduct, including but not limited to: (i) stealing and misusing GMH's nonpublic Information, (ii) working with a third-party competitor for its own financial gain, (iii) failing to perform its responsibilities and loyalties owed to GMH, and (iv) failing to disclose the nature of Defendant Fitts' conflict of interest—and, in particular, her decision to work with the Buying Group—to GMH.

143.     As a direct and proximate result of Defendants' breaches of fiduciary duties to GMH, GMH incurred damages, including but not limited to: (i) loss of revenue and capital, (ii) loss of Confidential Information, (iii) loss of valuable business, (iv) loss of profits and future profits, and (v) other damages, all in an amount to be determined at trial.

### COUNT IV– MISAPPRORPRIATION OF TRADE SECRETS
### VIOLATION OF THE U.S. DEFEND TRADE SECRETS ACT ("DTSA")
### (All Defendants)

144.     GMH hereby repeats, realleges, and incorporates by reference the allegations in the preceding paragraphs, as if set forth herein.

145.    As set forth above, GMH's trade secrets include, without limitation, confidential communications with PAC, GMH's strategic vision for the acquisition, its financial estimates and projections, potential equity sources, underwriting, site-visit reports, title and survey reports, market analysis, university research, capital expenditure and property budget calculations of future revenues and property values, return on investment calculations, and voluminous proprietary work product as to how the deal to acquire the PAC Portfolio could be closed and then managed efficiently in subsequent years.

146.    This information relates to GMH's provision of products and services through the United States and/or is otherwise utilized in interstate commerce.

147.    GMH's trade secrets are highly valuable to GMH, which spends significant sums, in terms of both financial and human resources, to develop, maintain, and safeguard this information, which is of great value to any competitor.

148.    GMH's trade secret information derives independent economic value from not being generally known to the public and not being readily ascertainable through proper means by others who could obtain economic value from the disclosure or use of the information.

149.    GMH thus keeps its trade secrets safe from disclosure through all appropriate and necessary means, including securing its files with password-protection, requiring employees to execute confidentiality agreements and abide by policies that expressly prohibit the use, removal, and disclosure of such information outside of GMH, and requiring the execution of a nondisclosure agreement as a prerequisite to a third party's receipt of GMH's information.

150.    Upon information and belief, Defendants misappropriated GMH's trade secrets in an improper and unlawful manner, as alleged herein.

151.     Defendants knew or should have known that GMH's trade secrets were to be kept confidential and should not be disclosed to competitors of GMH, CBRE's other clients, or utilized for their own personal benefit.

152.     Despite Defendants' knowledge of the confidentiality of GMH's trade secrets, upon information and belief, Defendants used GMH's trade secrets to solicit other customers to do business with CBRE instead of GMH.  This involved the unauthorized use of such nonpublic information such as financial information, borrowing needs of GMH, pricing practices, techniques, sales, methods, and marketing, in breach of contractual, policy and legal duties of Fitts and CBRE to maintain the secrecy of such Confidential Information and not to disclose it.

153.     Defendants' misappropriation of GMH's trade secrets have caused GMH irreparable injury for which monetary damages alone are an inadequate remedy.

154.     Defendants willfully and maliciously misappropriated GMH's trade secrets, with the intention of using these assets to cripple GMH.

155.     This willful and malicious misappropriation of GMH's trade secrets justifies the award of reasonable attorneys' fees to GMH under the DTSA.

156.     As a consequence of the foregoing, GMH has sustained damages including but not limited to the: (i) loss of revenue and capital, (ii) loss of its trade secrets, (iii) loss of valuable business, (iv) loss of profits and future profits, and (v) the expenditure of attorneys' and related consultants' fees, and (vi) other damages, all in an amount to be determined at trial.

### <u>COUNT V – MISAPPRORPRIATION OF TRADE SECRETS</u>
### VIOLATION OF THE PENNSYLVANIA UNIFORM TRADE SECRETS ACT OR
### NEW YORK COMMON LAW
### (All Defendants)

157.     GMH hereby repeats, realleges, and incorporates by reference the allegations in the preceding paragraphs, as if set forth herein.

158.     Upon information and belief, Defendants have misappropriated and utilized Plaintiffs' trade secrets in violation of the Pennsylvania Uniform Trade Secrets Act or the common law of the State of New York.

159.     Defendants have acted willfully, maliciously, and with reckless disregard to GMH's rights, entitling GMH to recovery of exemplary damages and recovery of its reasonable attorneys' fees.

160.     As a consequence of the foregoing, GMH has sustained damages including but not limited to the: (i) loss of revenue and capital, (ii) loss of its trade secrets, (iii) loss of valuable business, (iv) loss of profits and future profits, (v) the expenditure of attorneys' and related consultants' fees, and (vi) other damages, all in an amount to be determined at trial.

## COUNT VI – CONVERSION
### (All Defendants)

161.     GMH hereby repeats, realleges, and incorporates by reference the allegations in the preceding paragraphs, as if set forth herein.

162.     GMH holds title to its Information, including proprietary financial and strategic modeling and due diligence, voluminous proprietary work product, and other confidential business information relating to the PAC Deal.

163.     Defendants wrongfully acquired the Information or other property that belongs to GMH and to which Defendants were not entitled to possess or utilize for any purpose other than advancing GMH's economic interests.

164.     Upon information and belief, Defendants willfully converted GMH's Information for their own use, benefit, and rival business interests.

165.     Upon information and belief, Defendants shared GMH's Information relating to the PAC Portfolio to third parties, including but not limited to Cardinal.

166.    As a result, GMH has suffered and will continue to suffer injury, damages, and irreparable harm.

### COUNT VII – TORTIOUS INTERFERENCE WITH CONTRACT
**(All Defendants)**

167.    GMH hereby repeats, realleges, and incorporates by reference the allegations in the preceding paragraphs, as if set forth herein.

168.    GMH developed and maintained and continues to develop and maintain third-party contractual relationships with business partners, customers, and lenders.

169.    Defendants know, knew, or reasonably should know or should have known about these third-party contractual relationships.

170.    Many of these contractual relationships with third-party contractual relationships are formalized in binding agreements, which Defendants reasonably should know or should have known about.

171.    Defendants intentionally, maliciously, and improperly interfered with, and continue to interfere with, GMH's third-party contractual relationships, including but not limited to inducing them to sever or not to commence contractual relationships with GMH.

172.    Defendants interfered with GMH's contractual relations by deliberately and improperly misappropriating GMH's Information for their own benefit, sharing GMH's Information with others to unlawfully compete with GMH and undermine GMH's contractual relationships with customers, business partners, and lenders, breaching their fiduciary duties to GMH, and violating the terms of the Letter Agreement and Nondisclosure Agreement.

173.    As a result, GMH has suffered and will continue to suffer injury, damages, and irreparable harm, as stated more specifically herein.

## COUNT IX – TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS
### (All Defendants)

174.    GMH hereby repeats, realleges, and incorporates by reference the allegations in the preceding paragraphs, as if set forth herein.

175.    GMH has developed and maintained and continues to develop and maintain prospective relationships with business partners, customers, and lenders, of whom CBRE and its agents were aware of in the course of their business relationships with GMH.

176.    Defendants know, knew, or reasonably should know or should have known about these prospective relationships.

177.    Defendants intentionally, maliciously, and improperly interfered with, and continue to interfere with, GMH's prospective relationships with its prospective customers, business partners and lenders, including but not limited to inducing them to sever or not to commence contractual relationships with GMH.

178.    Defendants interfered with GMH's contractual relations by deliberately and improperly misappropriating GMH's Information for their own benefit, sharing GMH's Information with others to unlawfully compete with GMH and undermine GMH's prospective customers, business partners, and lenders, breaching their fiduciary duties to GMH, and violating the terms of the Letter Agreement and Nondisclosure Agreement.  As a result, GMH has suffered and will continue to suffer injury, damages, and irreparable harm, as stated more specifically herein.

## COUNT X – UNFAIR COMPETITION
### (All Defendants)

179.    GMH hereby repeats, realleges, and incorporates by reference the allegations in the preceding paragraphs, as if set forth herein.

180.    Defendants have engaged in conduct that is contrary to honest industrial and commercial practice and, thus, has engaged in unfair competition, in violation of the common law of the Commonwealth of Pennsylvania and the State of New York.

181.    Defendants gained an unfair competitive advantage over GMH by breaching their fiduciary duty of loyalty to GMH and misappropriating GMH's Information for their own benefit.

182.    Defendants also gained an unfair competitive advantage over GMH by tortiously interfering with GMH's contractual and business relationships.

183.    These acts constitute unfair methods of competition, considering the nature of the conduct and its likely effect on both GMH and the public.

184.    Defendants have engaged in the aforementioned acts willfully and deliberately, and their conduct has caused commercial injury to GMH.

185.    As a result, GMH is entitled to compensatory and punitive damages as a result of Defendants' tortious conduct in an amount to be proven at trial.

## COUNT XI – UNJUST ENRICHMENT
### (All Defendants)

186.    GMH hereby repeats, realleges, and incorporates by reference the allegations in the preceding paragraphs, as if set forth herein.

187.    At all relevant times, GMH has been the owner of its Information.

188.    In the scope of their relationship, GMH conferred the benefit of its Information to Defendants.

189.    Defendants wrongfully used GMH's Information to advance their own financial interests at the expense and detriment of GMH.

190.    Upon information and belief, Defendants' misuse of GMH's Information has provided Defendants with innumerable benefits without the time, effort, and expense and cost of developing the same.

191.    Defendants have not paid for the benefits they have received and their conduct, as described herein, constitutes unfair competition and has unjustly enriched Defendants at GMH's expense.

192.    As a direct and proximate result of the Defendants' wrongdoing, GMH has suffered injury and loss to the direct gain of Defendants.

193.    As a result, it would be unjust for Defendants to retain such benefits without consideration to GMH.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff GMH Capital Partners, LP, requests that this Court grant judgment in their favor and against Defendants and order the following relief:

(A) A judgment for Plaintiffs and against each Defendant on all causes of action;

(B) Reimbursement to GMH in the amount of approximately $5 million (plus interest), the payment to PAC that Defendants' wrongful conduct caused GMH to forfeit, plus all costs and time incurred in due diligence and the creation of the proprietary trade secrets in an amount in excess of $1,500,000;

(C) Reimbursement for loss of business fees on the PAC Portfolio deal, including but not limited to pursuit fees, operating profits, management fees, asset appreciation, and other ancillary revenue, *i.e.*, lost profits, loss of opportunity, and real-estate value in an amount in excess of $70,000,000;

(D) Reimbursement to GMH of any and all fees paid to Defendants (plus interest) for their consulting services;

(E) Disgorgement of any other profits, monetary compensation, or non-monetary compensation that Defendants received as a result of the unlawful conduct set forth above;

(F) An award of GMH's attorneys' fees to the full extent provided for by U.S. Defend Trade Secrets Act, codified at 18 U.S.C. § 1836, *et seq.* and the Pennsylvania Uniform Trade Secrets Act, codified at 12 Pa. Const. Stat. § 5301, *et seq.*

(G) The doubling of all damages based on the willful and malicious nature of the Defendants' conduct as a violation of the Defend Trade Secrets Act;

(H) An award of prejudgment and post-judgment interest;

(I) An award of punitive damages in an amount to be determined by the Court; and

(J) Any and all such other and further relief as the Court deems just and proper.

Respectfully submitted,

**CIARDI CIARDI & ASTIN**

*/s/ Jennifer C. McEntee*

By:   Jennifer C. McEntee, Esquire
1905 Spruce Street
Philadelphia, PA  19103
jcranston@ciardilaw.com
Telephone: 215-557-3550
Facsimile:  215-557-3551

Date:   January 14, 2024

Ciardi Ciardi & Astin
Albert A. Ciardi III
Nicole M. Nigrelli
Jennifer C. McEntee
1905 Spruce Street
Philadelphia PA 19103