UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GMH CAPITAL PARTNERS,

                              Plaintiff,

          – against –

JACLYN FITTS, CBRE CAPITAL
ADVISORS, INC., AND CBRE, INC.,

                              Defendants.

**OPINION & ORDER**

24-cv-00290 (ER)

RAMOS, D.J.:

          GMH Capital Partners, LP ("GMH") brings this action against Jaclyn Fitts

("Fitts"), CBRE Capital Advisors, Inc. ("CBRE Cap"), and CBRE, Inc. (together with

CBRE Cap, "CBRE"), alleging various federal and state claims arising out of GMH's

failure to acquire a real estate portfolio with the assistance of Defendants.  Before the

Court is Defendants' motion to dismiss the remaining claims against CBRE.[1]  For the

reasons set forth below, the motion is GRANTED.

## I.      BACKGROUND

### A.  Factual Background

          Unless otherwise noted, the following facts are taken from GMH's Amended

Complaint, Doc. 23, which the Court accepts as true for the purpose of Defendants'

motion.  *Koch v. Christie's International PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

          *1.  The Parties*

          GMH is a real estate company that invests in real estate assets and operating

companies.  Doc. 23 ¶¶ 27–28.  It is a Delaware limited partnership with its principal

place of business in Pennsylvania.  *Id.* ¶ 21.

---

[1] In its opposition to the motion, GMH abandoned all claims against Jaclyn Fitts, as well as its claims
against CBRE for conversion, unfair competition, and unjust enrichment.  Doc. 39 at 6.  The Court
therefore addresses only the claims against CBRE for breach of contract, misappropriation of trade secrets,
and tortious interference.

CBRE, Inc. is a commercial real estate services and investment corporation. *Id.* ¶ 37.  It is incorporated in Delaware with its principal place of business in Texas. *Id.* ¶ 23.

CBRE Cap is a subsidiary of CBRE, Inc. that offers investment banking services with expertise in raising capital and advisory services. *Id.* ¶¶ 36.  It is a Delaware corporation with its principal place of business in New York. *Id.* ¶ 22.

Fitts, who has been dismissed from this action, is an employee of CBRE who served as Director of its National Student Housing Group at all times relevant to the facts alleged in the complaint. *Id.* ¶¶ 25–26, 56.  Fitts is a citizen of Texas. *Id.* ¶ 24.

   *2.  The Agreement Between GMH and CBRE*

On May 24, 2019, GMH entered into an agreement to purchase a portfolio of eight student-housing assets (the "PAC Portfolio") from Preferred Apartment Communities, Inc. ("PAC") for $475 million. *Id.* ¶¶ 29, 32.  GMH paid a $4.75 million non-refundable deposit in exchange for an exclusive right to finalize the purchase before March 4, 2020. *Id.* ¶¶ 33, 34.  GMH alleges that it "incurred over a million dollars of internal diligence time plus hundreds of thousands of dollars in diligence costs pursuant to the May 24th agreement," totaling an initial investment of approximately $6.5 million. *Id.* ¶¶ 1, 33.  GMH further alleges that between May 2019 and March 2020, it invested several million dollars in the development of proprietary information concerning the acquisition of the PAC Portfolio (the "PAC Deal"). *Id.* ¶ 35.  GMH alleges that the potential value generated by its efforts could have exceeded $70 million had it successfully closed on the PAC Deal. *Id.*

In January and February of 2020, CBRE pitched GMH about potentially using its services to secure the capital necessary to acquire the PAC Portfolio. *Id.* ¶ 38.  To facilitate these discussions, GMH and CBRE, Inc. entered into a nondisclosure agreement (the "NDA") on January 26, 2020. *Id.* ¶ 41; Doc. 23-1, Ex. A.  The NDA stated that CBRE, Inc. would "not use [GMH's] Confidential Information for any purpose other than to evaluate the Proposed Investment and shall not disclose Confidential Information to

any third party." Doc. 23-1, Ex. A § 2.  The NDA defines "Confidential Information" as including, but not limited to:

> Offering materials, notes, plans, legal agreements, models, analyses, track records, financial statements and other financial records, executive and employee compensation data, due diligence materials (including, without limitation, presentations or investment memorandums as well as drafts, amendments or derivative works thereof), compilations, studies, interpretations, documents or records containing, referring, relating to, based upon or derived from any Confidential Information, in whole or in part.

*Id.* § 1 (b).

The NDA also prevents CBRE, Inc. from "enter[ing] into any transaction with any party . . . introduced to [CBRE] by GMH (the "Introduced Party") similar to, in competition with, or which otherwise could have the effect of preventing GMH from receiving the full benefit of, the Proposed Investment and/or the transactions contemplated by this Agreement . . . [or] solicit[ing] the Introduced Party to enter into any such transaction." *Id.* § 6 (a)–(b).

At a February 5, 2020 meeting, GMH reviewed a "pitch book" prepared by CBRE that featured Fitts as part of the team.  Doc. 23 ¶¶ 46–48.  Impressed by Fitts' expertise and experience as CBRE's Director of National Student Housing Group, GMH agreed to retain CBRE on the condition that Fitts take a "substantial lead role" in GMH's efforts to obtain financing for the PAC Deal.  *Id.* ¶¶ 49, 57.  GMH was aware at the time that Fitts typically worked on the brokerage side of CBRE.  *Id.* ¶ 82.  CBRE accommodated GMH's request and assigned Fitts to the GMH account in an advisory role.  *Id.* ¶¶ 58–59.

On February 26, 2020, GMH and CBRE Cap entered into an agreement (the "Letter Agreement") whereby CBRE Cap agreed to act as GMH's exclusive financial advisor to procure equity financing for the PAC Deal.  *Id.* ¶ 50; Doc. 23-2, Ex. B.  The Letter Agreement disclaims "the creation of any fiduciary relationship" and disavows "any responsibility for [GMH]'s underlying business decision to pursue or not to pursue any business strategy or to effect or not effect any Financing."  Doc. 23-2, Ex. B §§ 1,

8(a).  Section 8(f) states that the Letter Agreement will not "be construed to prohibit or limit the ability of CBRE Cap or its affiliates from pursuing, investigating, analyzing or engaging in other business relationships with entities other than [GMH], notwithstanding that such entities may be engaged in a business which is similar to the business of [GMH]."  It continues:

> [GMH] acknowledges that . . . CBRE Cap or its affiliates may be engaged in securities trading and brokerage activities as well as investment banking and financial advisory services and may hold positions or effect transactions . . . in equity, debt or other securities of [GMH] or any other party that may be involved in a Transaction. … [GMH] acknowledges and agrees that . . . affiliates of CBRE Cap reserve the right to pursue opportunities to arrange and/or provide new financing to other parties to a Transaction. . . . [GMH] acknowledges and understands that the interests of such affiliates as arranger or provider of financing to such parties may differ from those of [GMH] with respect to the pricing, timing and terms and conditions of a Transaction or otherwise, and [GMH] expressly waives any conflicts of interests which may result from the multiple roles CBRE Cap and its affiliates may have as advisor to [GMH] and as arranger or provider of financing to other parties to a Transaction.  Notwithstanding anything to the contrary in this Section 8(f) or this letter agreement, CBRE Cap agrees that during the term of this letter agreement, CBRE Cap shall not provide financial advisory services in connection with any strategic transaction through the issuance of privately-placed equity substantially similar to the Transaction contemplated herein for any company whose primary business is student housing development, management, ownership or operation, without the Company's prior written consent . . . .

*Id.* § 8(f).

The Letter Agreement also specified that CBRE Cap would receive a financing fee, calculated as a percentage of the capital secured, if CBRE successfully obtained financing for GMH during the term of the agreement.  *Id.* § 3(a).

3.  *GMH Fails to Close on the PAC Portfolio*

After the execution of the Letter Agreement, GMH worked closely with CBRE and Fitts to create a viable financing strategy.  Doc. 23 ¶¶ 63–64.  As part of its strategy, CBRE created a list of potential equity sources for GMH that included TPG Realty

4

Partners ("TPG").  *Id.* ¶ 65.  CBRE allegedly failed to facilitate a discussion between TPG and GMH until several months later, at which point TPG informed GMH that it had a conflict on the PAC transaction.  *Id.* ¶ 66.

By March 4, 2020, GMH had failed to finalize the purchase of the PAC Portfolio and lost its exclusive right to do so.  *Id.* ¶¶ 67, 89.  Nonetheless, GMH remained committed to submitting a bid and continued conducting its own due diligence and sharing information with CBRE to assist in the procurement of financing.  *Id.* ¶ 68.

At some point in March 2020, the COVID-19 pandemic interrupted GMH's plans to finalize its acquisition strategy.  *Id.* ¶ 69.  Although the complaint does not specify from where or who, CBRE allegedly received notice that a "material portion of [its] proposed equity for the PAC Portfolio deal would likely be unavailable until the COVID-19 Pandemic stabilized."  *Id.* ¶ 70.  This information was shared with PAC who allegedly continued to work exclusively with GMH despite GMH's inability to obtain financing. *Id.* ¶¶ 71–72.

On April 22, 2020, CBRE Cap informed GMH that Fitts was removing herself from the team advising GMH due to an unspecified conflict.  *Id.* ¶ 92.  Despite Fitts' departure, GMH continued working with CBRE Cap to obtain financing for a potential bid.  *Id.* ¶ 100.

PAC continued to work exclusively with GMH until Fitts notified GMH on June 10, 2020 that she was taking the PAC portfolio to market on behalf of PAC as its broker, and that a data room would be available for potential bidders on June 16, 2020.  *Id.* ¶¶ 72, 94.  GMH alleges that it had no reason to believe at this time that Fitts or CBRE were disloyal, and informed both PAC and Fitts of its intention to participate in the bidding process.  *Id.* ¶¶ 98–100.  GMH continued working with CBRE Cap to prepare and timely submit a bid, and GMH did not seek to preclude Fitts from representing another interested party with respect to the transaction.  *Id.*  PAC also indicated its desire to continue working with GMH by agreeing to apply the $4.75 million non-refundable

deposit GMH had paid for its then expired exclusive purchase right to the possible final purchase price. *Id.* ¶ 101. The submission deadline for all bids was July 30, 2020. *Id.* ¶ 110.

GMH alleges that it learned that PAC sold the PAC Portfolio to TPG and Cardinal Group Investment Management LLC ("Cardinal") (together, "the Buying Group") for $478.7 million on November 3, 2020. *Id.* ¶ 111. TPG is a real estate equity investment firm that was previously on CBRE's list of potential equity sources for GMH, and Cardinal is a student-housing real estate company that is allegedly a direct competitor of GMH. *Id.* ¶¶ 15, 103. GMH later learned that the Buying Group's winning bid was submitted on July 1, 2020, two weeks after the data room had opened, and roughly a month before the bid deadline. *Id.* ¶ 113.

### 4. *CBRE's Alleged Betrayal of GMH*

GMH alleges that it was not until 2023 that it learned that CBRE "willfully and maliciously" betrayed GMH by sharing GMH's confidential information, and advising the Buying Group on its acquisition of the PAC Portfolio. *Id.* ¶¶ 73–76. Specifically, GMH indicates that it learned, upon information and belief, that CBRE was "plagued by in-fighting regarding commission structures," which financially incentivized Fitts to abandon the GMH team and instead broker the PAC transaction. *Id.* ¶¶ 12, 80. GMH alleges that this resulted in CBRE engaging in a scheme to sabotage GMH's potential acquisition of the PAC Portfolio, whereby Defendants pretended to attempt to secure financing for GMH while simultaneously assisting the Buying Group on the same transaction. *Id.* ¶¶ 13, 14.

GMH makes the following allegations in support of this theory, all based upon information and belief: In April 2020, Fitts secured the brokerage listing for the PAC Portfolio and recused herself from the GMH team because CBRE's commission structure incentivized employees to broker deals rather than represent potential buyers in a transaction. *Id.* ¶¶ 80, 90. Fitts also allegedly "realized she could pocket even more from

the transaction" by assisting the Buying Group and negotiating compensation for herself. *Id.* ¶ 87, 118.  Subsequently, in May 2020, CBRE allegedly contacted TPG and Cardinal to inform them that the PAC Portfolio was coming to market.  *Id.* ¶ 15.[2]  It is unclear from the complaint if it was Fitts or another CBRE employee who allegedly contacted TPG and Cardinal.  GMH alleges that Fitts then agreed to assist TPG and Cardinal to work together to acquire the PAC Portfolio, which included raising debt and equity capital for the Buying Group.  *Id.* ¶¶ 103–04, 125(e).  GMH also alleges that in doing so, Fitts shared GMH's confidential information related to the PAC Portfolio which Cardinal used to prepare its bid before the PAC Portfolio opened for public bidding.  *Id.* ¶¶ 15, 105–06, 114.  GMH alleges that CBRE was aware that Fitts was assisting the Buying Group in preparing its bid.  *Id.* ¶ 108.

According to GMH, the Buying Group's ability to submit a bid within two weeks of PAC opening the data room was "an impossible feat given the complexity of the bid and the travel limitations imposed by COVID-19," and that the Buying Group could not have done so without CBRE breaching its contractual obligations under the NDA and the Letter Agreement, and improperly sharing GMH's confidential information.  *Id.* ¶¶ 113, 115, 117.

5. *The Tolling Agreements*

On November 3, 2023, three years after GMH allegedly learned that PAC had closed the sale of the PAC Portfolio to the Buying Group, the parties signed an initial tolling agreement which suspended the running of the statute of limitations for any claims arising out of the events described above from November 2, 2023 to November 17, 2023.

---

[2] According to GMH, Fitts had a pre-existing business relationship with Gregory Martini, the Vice President of Acquisitions at Cardinal, who was a former employee of GMH.  GMH also alleges that Fitts had a business relationship with Ty Newell of TPG.  *Id.* n. 1.

Doc. 39-1, Ex. A.[3]  The tolling period was extended by a second agreement on November 17, 2023 until January 14, 2024.  Doc. 39-1, Ex. B.

### B.    Procedural Background

GMH filed this lawsuit on January 14, 2024, alleging various state and federal claims against Fitts, CBRE Cap, and CBRE, Inc.  Doc. 1.  On March 28, 2024, GMH filed an amended complaint.  Doc. 23.  Jurisdiction is premised on federal question jurisdiction.  *Id.* ¶ 19.

On April 29, 2024, Fitts, CBRE Cap and CBRE, Inc. filed a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2), and failure to state a claim pursuant to Rule 12(b)(6).  Doc. 30.  GMH then filed its response in opposition to the motion on June 14, 2024 in which it abandoned all claims against Fitts, abandoned several claims against both CBRE Cap and CBRE, Inc., and attached a proposed second amended complaint.  Doc. 39.

## II.    LEGAL STANDARD

When considering a motion to dismiss pursuant to Rule 12(b)(6), a court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor.  *Koch v. Christie's International PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  But "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court

---

[3] The Court may consider the tolling agreements even though they were not attached to the complaint or incorporated by reference because GMH's misappropriation of trade secrets and tortious interference claims depend upon the tolling of the statute of limitations, thus making the tolling agreements "integral" to GMH's claims.  *See International Audiotext Network, Inc. v. American Telephone & Telegraph Company*, 62 F.3d 69, 72 (2d Cir. 1995).

to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). To state a plausible claim, the plaintiff must " 'raise a reasonable expectation that discovery will reveal evidence' of the wrongdoing alleged, 'even if it strikes a savvy judge that actual proof of those facts is improbable.' " *Citizens United v. Schneiderman*, 882 F.3d 374, 380 (2d Cir. 2018) (quoting *Twombly*, 550 U.S. at 556). If the plaintiff has not "nudged [the] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

## III.    DISCUSSION

GMH brings claims against CBRE for breach of contract, misappropriation of trade secrets, and tortious interference with contract and business relations. Doc. 23 ¶¶ 120–53, 160–71.

The only claim arising under federal law is GMH's misappropriation of trade secrets claim pursuant to the Federal Defend Trade Secrets Act ("DTSA"). 18 U.S.C. § 1836. Accordingly, the Court will address the DTSA claim before considering the state law claims.

### A.    Misappropriation of Trade Secrets Under the DTSA

GMH alleges that CBRE "willfully and maliciously" used GMH's trade secrets to solicit other customers to do business with CBRE in violation of the DTSA. Doc. 23 ¶¶ 137–49.

"To state a claim for misappropriation under the DTSA, a plaintiff must allege that it possessed a trade secret that the defendant misappropriated." *Iacovacci v. Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 380 (S.D.N.Y. 2020) (citing 18 U.S.C. § 1836(b)(1)). The elements of misappropriation of trade secrets claims under federal and New York law are fundamentally the same. *See id.* ("Since [t]he requirements are similar, courts have found that a [c]omplaint sufficiently plead[ing] a DTSA claim . . .

also states a claim for misappropriation of trade secrets under New York law." (citation and internal quotation marks omitted)).  Accordingly, "courts in this Circuit cite to New York common law when deciding matters under the DTSA."  *My Mavens, LLC v. Grubhub, Inc.*, No. 20-cv-4657 (PGG), 2023 WL 5237519, at *18 (S.D.N.Y. Aug. 14, 2023); *see also Iacovacci*, 437 F. Supp. 3d at 380 ("[D]istrict courts often rely on cases discussing misappropriation under New York law to analyze DTSA claims." (citation omitted)); *Sapir v. Rosen*, No. 20-cv-6191 (RA), 2021 WL 4482277, at *4 (S.D.N.Y. Sept. 30, 2021) ("[T]he Court looks to New York trade secret law as instructive in deciding whether the documents described in Plaintiffs' [c]omplaint are plausibly alleged to be trade secrets under the DTSA.").

It is also well-established that a three-year statute of limitations applies to claims under the DTSA.  *See Zirvi v. Flatley*, 433 F. Supp. 3d 448, 459 (S.D.N.Y. 2020) (citing 18 U.S.C. § 1836(d)).

CBRE argues that GMH's misappropriation of trade secrets claims are barred by the statute of limitations, and alternatively, that GMH has failed to sufficiently plead a claim under the applicable legal framework.

### 1.  *Statute of Limitations*

While courts cannot ordinarily decide a statute of limitations defense on a motion to dismiss, dismissal is appropriate when it is "clear from the face of the complaint, and matter of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law."  *Sewell v. Bernardin*, 795 F.3d 337, 339 (2d Cir. 2015) (citations omitted); *see also McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004) ("[A]n affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6), without resort to summary judgement procedure, if the defense appears on the face of the complaint." (citation omitted)); *Essex Capital Corporation v. Garipalli*, No. 17-cv- 6347 (JFK), 2018 WL 6618388, at *2 (S.D.N.Y. Dec. 18, 2018).  "Where a plaintiff's 'claims are time-barred on the face of its own complaint, [plaintiff] has the burden of pleading

facts sufficient to establish that the statutes of limitations should be tolled.' " *Essex Capital*, 2018 WL 6618388, at *2 (quoting *VoiceOne Communications, LLC v. Google Inc.*, No. 12-cv-9433 (PGG), 2014 WL 10936546, at *7 (S.D.N.Y. Mar. 31, 2014)).

For a misappropriation of trade secrets claim, the limitations period begins to run from the date which the plaintiff "knew or should have known that the alleged trade secrets were wrongfully acquired, disclosed or used." *Zirvi*, 433 F. Supp. 3d at 459 (citation omitted) (explaining when the statute of limitations period begins to run under 18 U.S.C. § 1836(d)); *see also Universal Instruments Corp. v. Micro Systems Engineering, Inc.*, 924 F.3d 32, 50 (2d Cir. 2019) (explaining that a claim accrues when "a reasonably diligent person in plaintiff's position would have been put on inquiry as to the claim"). Thus, CBRE's statute of limitations defense depends on whether, and when, the complaint indicates that GMH knew or should have known that CBRE disclosed trade secrets to the Buying Group. GMH alleges that it did not learn of the sale to the Buying Group until November 3, 2020, and the statute of limitations could not have begun to accrue until that date at the earliest. Doc. 23. ¶ 111; Doc. 39 at 3–5. This would render GMH's claims timely in light of the November 3, 2023 and November 17, 2023 tolling agreements, which together tolled the statute of limitations through January 14, 2024. Doc. 39-1, Ex. A, B.

In response, CBRE argues that the parties entered into the tolling agreements after the statute of limitations period had already lapsed because GMH should have known that PAC announced its sale to the Buying Group on September 24, 2020. *See* Doc. 32-2; Doc. 31 at 18. In support, CBRE submitted an exhibit to the Court of PAC's SEC Form 8-K filing which indicates that PAC issued a press release announcing its sale to the Buying Group on September 24, 2020. Doc. 32-2. According to CBRE, PAC's public announcement of the sale should have put GMH on notice that the PAC Portfolio was sold in September 2020, and not on November 3, 2020 as GMH alleges. Doc. 31 at 18. CBRE argues that this information combined with GMH's own allegation that it "had all

the 'pieces' of information at the time it lost the PAC transaction but failed to 'realize' it until years later," is evidence that it should have known of the misappropriation in September 2020. *Id.* (quoting Doc. 23 ¶ 12). The Court disagrees.

Regardless of whether the Court may take judicial notice of the announcement of the sale in September 2020, the Court finds that the complaint contains no allegations suggesting that GMH should have been on notice of the misappropriation of trade secrets at that time. Indeed, the complaint specifically alleges that even after Fitts informed GMH that she was taking the PAC Portfolio to market, GMH had no reason to believe CBRE or Fitts were disloyal to GMH. Doc. 23 ¶ 98. The complaint makes no allegations suggesting that GMH knew or should have known otherwise at any point before November 3, 2020. Rather, GMH specifically alleges that it "did not realize the Defendants' betrayal and subterfuge immediately after it lost the PAC transaction to a competitor" and that it "did not learn of Defendants' surreptitious misconduct [until] 2023." *Id.* ¶¶ 12, 76.

Accepting all factual allegations as true and drawing all reasonable inferences in GMH's favor, the Court finds that GMH did not have reason to believe CBRE misappropriated GMH's trade secrets until at least November 3, 2020. Accordingly, the tolling agreements prevented the claims for misappropriation and tortious interference from expiring before GMH filed its complaint.

### 2. Possession of a Trade Secret

CBRE also argues that GMH fails to allege the existence of a trade secret. Doc. 31 at 18–21.

The DTSA defines trade secrets as "all forms and types of financial, business, scientific, technical, economic, or engineering information," but only if the owner of the information "take[s] reasonable measures to keep such information secret" and "the information derives independent economic value . . . from not being generally known to, and not readily ascertainable through proper means by, another person who can obtain

economic value from the disclosure or use of the information." 18 U.S.C.A. § 1839(3).
A trade secret is "not simply information as to a single or ephemeral event[] in the
conduct of the business; rather, it is a process or device for continuous use in the
operation of the business." *Elsevier Inc. v. Doctor Evidence, LLC*, No. 17-cv-5540
(KBF), 2018 WL 557906, at *3 (S.D.N.Y. Jan. 23, 2018) (quoting *Softel, Inc. v. Dragon
Medical and Scientific Communications, Inc.*, 118 F.3d 955, 968 (2d Cir. 1997)). "Trade
secrets are a narrow category of confidential information; to survive a motion to dismiss,
a party alleging that it owns a trade secret must put forth specific allegations as to the
information owned and its value." *Id.* at *4 (citing *IDX Systems Corp. v. Epic Systems
Corp.*, 285 F.3d 581, 583 (7th Cir. 2002)).

Although the Second Circuit has not articulated a specificity requirement for
pleading a trade secret, this Court routinely requires that the complaint must plead trade
secrets with sufficient specificity to apprise the defendants of what they are alleged to
have misappropriated. *Lawrence v. NYC Medical Practice, P.C.*, No. 18-cv-8649
(GHW), 2019 WL 4194576, at *4 (S.D.N.Y. Sept. 3, 2019); *see also Medidata Solutions,
Inc. v. Veeva Systems Inc.*, No. 17-cv-589 (LGS), 2018 WL 6173349, at *3 (S.D.N.Y.
Nov. 26, 2018); *Democratic National Committee v. Russian Federation*, 392 F. Supp. 3d
410, 448 (S.D.N.Y. 2019). Although a plaintiff is not required to disclose the precise
trade secrets misappropriated to survive a motion to dismiss, "the law requires the trade
secret claimant to describe the secret with sufficient specificity that its protectability can
be assessed and to show its compilation is unique." *Sapir*, 2021 WL 4482277, at *5;
*Lawrence*, 2019 WL 4194576, at *4 (explaining that it is "not necessary to disclose every
detail of an alleged trade secret in a complaint" (citation omitted)).

Courts consider several factors, which need not all be alleged, to determine
whether information qualifies as a trade secret:

> (1) the extent to which the information is known outside of the busi-
> ness; (2) the extent to which it is known by employees and others
> involved in the business; (3) the extent of measures taken by the

business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Elsevier*, 2018 WL 557906, at *3–4 (citation omitted).

Here, GMH has not described the alleged trade secrets with sufficient specificity such that their protectability can be assessed, and instead relies on broad categories of information which it refers to interchangeably as both trade secrets and confidential information throughout the complaint. The alleged trade secrets include its confidential communications with PAC, its strategic vision for the acquisition, its financial estimates, potential equity sources, site-visit reports, market analysis, university research, borrowing needs, pricing practices, techniques, sales methods, marketing strategies, return on investment calculations, and "voluminous proprietary work product as to how the deal to acquire the PAC Portfolio could be closed and then managed efficiently in subsequent years." Doc. 23 ¶¶ 138, 145. Notably, this is the same "confidential information" that GMH alleges was disclosed in breach of the NDA, however, GMH does not identify any specific materials or documents or explain why these categories of information are trade secrets. *See Elsevier*, 2018 WL 557906, at *6 ("Alleging the existence of general categories of confidential information, without providing any details to generally define the trade secrets at issue, does not give rise to a plausible allegation of a trade secret's existence." (citation, emphasis, and internal quotation marks omitted)); *Zirvi*, 433 F. Supp. 3d at 465 (dismissing claim where the description of trade secrets resembled vague and broad categories of information).

In its opposition, GMH argues that the categories of documents listed in the complaint comprise "project-specific details and internal processes that, at every stage of its relationship with the Defendants, [GMH] sought to safeguard." Doc. 39 at 23–24. Further, GMH argues that it went to great lengths to safeguard this information, which "is of great value to any competitor." *Id.*; Doc. 23 ¶ 140. However, the conclusory

allegation that information is valuable to competitors and that it sought to keep that information secret does not confer trade secret status. *Elsevier*, 2018 WL 557906, at *6 (explaining that general allegations regarding "confidential information" and "processes" do not give rise to a plausible trade secrets claim).

Moreover, GMH's complaint does not allege that its alleged trade secrets derive independent economic value from their secrecy. Instead, GMH makes conclusory allegations that its "trade secrets are highly valuable to GMH, which spends significant sums, in terms of both financial and human resources, to develop, maintain and safeguard this information, which is of great value to any competitor." Doc. 23 ¶ 140. However, GMH fails to offer any support for why these categories of information provide it with a valuable edge over its competitors, or why its competitors could not have duplicated the alleged trade secrets from generally available information. *See Garvey v. Face of Beauty LLC*, 634 F. Supp. 3d 84, 97 (S.D.N.Y. 2022) ("[E]xcept where the alleged trade secret conveys a competitive advantage and cannot be readily duplicated from generally available information, marketing strategies, or mere knowledge of the intricacies of a business do not rise to the level of a trade secret." (citations and internal quotation marks omitted)); *Rodney v. United Masters,* No. 21-cv-5872 (DG)(LB), 2023 WL 2184865, at *6 (E.D.N.Y. Feb. 10, 2023) (finding that the plaintiff failed to allege that its trade secrets derived independent economic value where plaintiff did not allege how its "processes, plans, or conclusions provided a valuable edge over competitors, or why such value was due to the secrecy of the underlying information").

GMH also repeats the language of the DTSA, alleging that its "trade secret information derives independent economic value from not being generally known to the public and not being readily ascertainable through proper means by others who could obtain economic value from the disclosure or use of the information." Doc. 23 ¶ 141. However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556, U.S. at 678.

Accordingly, the Court finds that GMH has failed to allege that it possessed a trade secret.

### 3. Misappropriation

Even if GMH could sufficiently allege the existence of a trade secret, it also fails to allege that CBRE misappropriated such information.

Under the DTSA, there are two definitions of "misappropriation," only one of which requires that the information was acquired by "improper means." *See Trahan v. Lazar*, 457 F. Supp. 3d 323, 344 (S.D.N.Y. 2020). The first defines misappropriation as the "acquisition of a trade secret of another person by a person who knows or has reason to know that the trade secret was acquired by improper means." 18 U.S.C. § 1839(5)(A). Misappropriation can also mean:

- (B) disclosure or use of a trade secret of another without express or implied consent by a person who–
  - (i) used improper means to acquire knowledge of the trade secret;
  - (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was–
    - (I) derived from or through a person who had used improper means to acquire the trade secret;
    - (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or
    - (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or
  - (iii) before a material change of the position of the person, knew or had reason to know that–
    - (I) the trade secret was a trade secret; and
    - (II) knowledge of the trade secret had been acquired by accident or mistake;

18 U.S.C. § 1839(5)(B)

Improper means includes the "inducement of a breach of a duty to maintain secrecy," like a contractual agreement not to disclose information. *Medidata Solutions*, 2018 WL 6173349, at *4 (quoting 18 U.S.C. § 1839(6)(A)).

GMH alleges that "Defendants used GMH's trade secrets to solicit other customers to do business with CBRE instead of with GMH." Doc. 23 ¶ 145. CBRE argues that because GMH does not allege which defendant misappropriated which trade secret under what circumstances, GMH has merely offered conclusory allegations that are insufficient to state a claim. Doc. 31 at 21. However, because the alleged disclosure of confidential information by Fitts which is referenced throughout the complaint concerns the same information that GMH alleges are trade secrets, the Court draws the reasonable inference that GMH also alleges that it was Fitts who misappropriated the alleged trade secrets. *See* Doc. 23.

GMH does not allege that Fitts acquired the trade secrets improperly because that information was voluntarily disclosed to Fitts while she was a part of the team advising GMH. *Id.* ¶¶ 61–62. Rather, GMH alleges that the trade secrets were misappropriated under 15 U.S.C. § 1839(5)(B), but does not specify how. Doc. 39 at 25. Presumably, GMH argues that Fitts disclosed the trade secrets without consent and had reason to know at the time of the disclosure that the information was acquired pursuant to the NDA and thus gave rise to a duty to maintain secrecy or to limit the use of the trade secret. *See* 15 U.S.C. § 1839(5)(B)(ii)(II). Despite the fact that Fitts did not personally sign the NDA, Fitts was at all times an employee of CBRE and thus the agreement presumably applied to her as well. *See* Doc. 23 ¶ 56.

Nonetheless, the Court finds that GMH has failed to allege misappropriation because it does not sufficiently allege that any confidential information was ever disclosed by Fitts to the Buying Group. Throughout the complaint GMH alleges upon information and belief that CBRE misappropriated GMH's confidential information,

which included its alleged trade secrets, by disclosing it to the Buying Group.  Doc. 23 ¶¶ 105, 116, 138, 143.  The Court finds that these allegations alone are insufficient.

Plaintiffs are permitted to plead facts on information and belief, particularly where "facts are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible." *Arista Records, LCC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (internal citation omitted) (citing *Iqbal*, 556 U.S. at 667).  However, such allegations must be "accompanied by a statement of the facts upon which the belief the is founded."  *JBCHoldings NY, LLC v. Pakter*, 931 F. Supp. 2d 514, 526–27 (S.D.N.Y. 2013) (dismissing allegations made upon information and belief where nothing was offered in support of the belief besides "conjecture and speculation"); *Brodie v. Green Spot Foods, LLC*, 503 F. Supp. 3d 1, 13 (S.D.N.Y. 2020) ("Courts in this Circuit look unfavorably upon conclusory pleadings made on information and belief … .").

The Court finds that GMH has not offered sufficient factual allegations to support a reasonable inference that Fitts ever shared any trade secrets with the Buying Group. Indeed, the only facts offered in support of GMH's theory are that Fitts received GMH's confidential information when she was a part of the team advising GMH, she left the team in April 2020, disclosed in June 2020 that she was taking the PAC Portfolio to market as PAC's broker, and that the Buying Group would not have been able to submit a competitive bid two weeks after the bidding period opened without obtaining CBRE's confidential information.  This argument is purely speculative.  *See La Russo v. St. George's University School of Medicine*, 936 F. Supp. 2d 288, 305 (S.D.N.Y. 2013) ("[T]he mere possibility that a set of facts might be true does not support a reasonable inference of those facts.  In other words, a complaint based on speculation alone does not state a claim." (citations omitted)).  GMH simply repeats throughout the complaint, on information and belief, that Fitts shared GMH's confidential information and trade secrets without providing any factual support.  These are precisely the kind of speculative "naked

assertion[s]" that are insufficient to survive a motion to dismiss.  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

Moreover, GMH's allegation that the Buying Group would not have been able to submit a winning bid of $478.7 million two weeks after the data room opened without obtaining GMH's confidential information and trade secrets is conclusory and unsupported by facts.  GMH merely asserts that that the complexity of the bid and the travel limitations imposed by COVID-19 would have made the timing of the bid "impossible," but does not explain why.  Doc 23. ¶ 113.  Indeed, the complaint makes no specific allegations as to why this bid was particularly complex, why two weeks with access to the data room would not be enough time for the Buying Group to prepare a bid on its own, or why travel limitations would have any impact on its ability to do so.  Notably, GMH also fails to adequately address the fact that the Buying Group had access to publicly available information filed with the SEC, including PAC's financial details and GMH's original bid.  Doc. 31 at 13; Doc. 32-1.[4]  Although the Court must draw all reasonable inferences in favor of the plaintiff, the Court is not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *Newton v. Kraft Heinz Foods Company*, No. 16-cv-04578 (RJD)(RLM), 2018 WL 11235517, at *2 (E.D.N.Y. Dec. 18, 2018) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

The Court finds that merely identifying Fitts as a recipient of alleged trade secrets, identifying a three-month time period in which the information could have been shared, and plainly alleging that the bid submitted by the Buying Group could not have been

---

[4] The Court may take judicial notice of facts from publicly available documents that "can be accurately and readily determined from sources whose accuracy cannot be questioned."  FED. R. EVID. 201(b)(2).  It is well-known that public companies are subject to reporting requirements with the SEC and that these documents are publicly available.  GMH also alleges in the complaint that its original bid, in which it had agreed with PAC to purchase the PAC Portfolio, was $475.4 million.  Accordingly, the Court may take judicial notice of the Form 8-K without converting the motion to one for summary judgement.  *See Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (taking judicial notice of public disclosure documents required to be filed with the SEC).

possible without access to that information is purely speculative.  Accordingly, the allegations contained in the complaint are insufficient to support a plausible inference that Fitts misappropriated GMH's trade secrets.

### B.  Remaining State Law Claims

In addition to its DTSA claim (Count III), GMH also asserts state law claims for breach of contract, misappropriation of trade secrets under the Pennsylvania Uniform Trade Secrets Act ("PUTSA") and New York common law, and tortious interference with contract and business relations (Counts I, II, IV, VI, and VII).  Jurisdiction on these claims is premised on supplemental jurisdiction.

"[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a); *see also Royal Canin U. S. A., Inc. v. Wullschleger*, 604 U.S. 22, 27 (2025) (stating that, under § 1367(a), as under *Mine Workers v. Gibbs*, 383 U.S. 715 (1966), supplemental jurisdiction applies to state-law claims that arise "from the same facts" as a federal-law claim over which a court has original jurisdiction).  "For purposes of section 1367(a), claims form part of the same case or controversy if they derive from a common nucleus of operative fact."  *Shahriar v. Smith & Wollensky Restaurant Group Inc.*, 659 F.3d 234, 245 (2d Cir. 2011) (citation and internal quotation marks and omitted).  Even where a plaintiff states a claim that satisfies the "same case or controversy" requirement, however, the Court may decline to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c).

Section 1367(c) provides that "district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c).  As the Supreme Court explained in *Royal Canin*, § 1367(c) describes the "contexts in which

state-law claims, though covered by § 1367(a)'s jurisdictional grant, are often better given to state courts." 604 U.S. at 32–33 (explaining that where the federal anchor claim is dismissed, the district court "may (and indeed, ordinarily should) kick the case to state court").

Because the Court dismisses GMH's sole federal claim, the Court declines to exercise supplemental jurisdiction over the remaining state law claims.

### C.    Leave to Amend

In its opposition to the motion, GMH asks the court to "deny the Motion to Dismiss, allow it to file the Second Amended Complaint, and proceed with discovery." Doc. 39 at 30; Doc. 39-1, Ex. C.  CBRE argues that this request does not comport with FED. R. CIV. P. 15(a)(2), which requires a party to seek the court's leave to amend its pleading for a second time.  Doc. 41 at 3.  CBRE also argues that the proposed amended complaint adds no additional factual allegations to support GMH's claim, and thus any amendment would be futile.  *Id.*

A request for leave to amend is not insufficient based on form alone.  *See Porat v. Lincoln Towers Community Association*, 464 F.3d 274, 276 (2d Cir. 2006) ("[A] lack of a formal motion is not a sufficient ground for a district court to dismiss without leave to amend." (citing *Oliver Schools, Inc. v. Foley*, 930 F.2d 248, 252–53 (2d Cir.1991))). Denial of leave might be proper where a plaintiff's request was inconspicuous and never brought to the court's attention.  *See In re Tamoxifen Citrate Antitrust Litigation*, 466 F.3d 187, 220 (2d Cir. 2006), abrogated on other grounds by *F.T.C. v. Actavis, Inc.*, 570 U.S. 136 (2013).  Here, although GMH does not explicitly request leave to amend in the event that the Court grants the motion, the Court finds that GMH's general request and attached proposed amended complaint is sufficient.

As a general matter, leave to file an amended complaint is freely granted when justice so requires, and "it is within the sound discretion of the district court to grant or deny leave to amend." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir.

2007). A district court may "deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *Id.* An amendment is considered futile where the plaintiff is unable to demonstrate that he would be able to cure the defects in a manner that would survive a motion to dismiss. *See Hayden v. County of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999).

The Court has reviewed the proposed second amended complaint and finds that it contains no additional factual allegations to redeem the deficiencies discussed above. The proposed second amended complaint merely removes Fitts as a defendant and removes Count V (Conversion), Count VIII (Unfair Competition), and Count IX (Unjust Enrichment). The amendment as presented would thus be futile. However, at the time the request was made, the Court had not decided on the precise defects that such a proposed amendment would be designed to cure. *See Loreley Financing (Jersey) No. 3 Limited v. Wells Fargo Securities, LLC*, 797 F.3d 160, 191 (2d Cir. 2015). Because it is not apparent that GMH will be unable to marshal sufficient facts to allege a violation of the DTSA, and considering the liberal spirit of Rule 15 and the fact that this is the first time the Court is addressing these claims, the Court grants GMH leave to amend. *See id.*

## IV.    CONCLUSION

For the foregoing reasons, CBRE's motion to dismiss is GRANTED. GMH may file a second amended complaint on or before April 18, 2025. If it chooses not to do so the case will be closed. The Clerk of the Court is respectfully directed to terminate the motion, Doc. 30.

It is SO ORDERED.

Dated:    March 28, 2025
          New York, New York

_____
        EDGARDO RAMOS, U.S.D.J.